LEON HIMES *vs.* THE COLE TEAMING CO.

NOVEMBER 3, 1916.

PRESENT:   Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1)  *Negligence.   Res Ipsa Loquitur.*

Plaintiff in stepping off a sidewalk in the rear of a team standing beside the curb was struck in the back and injured. It appeared that the movement of the team backward was practically simultaneous with plaintiff's act in stepping from the sidewalk; that this movement was initiated by one of the horses starting forward as the driver placed one foot on the cross bar preparatory to mounting to his seat. There was no evidence that the driver did or said anything to make the horses move backward, nor any evidence of negligence on his part by any act of omission, as failing to guard against a movement which he had reason to expect or anticipate.

The declaration charged the driver with negligence in carelessly, negligently and unskillfully managing, controlling and driving the team.

*Held,* that upon the declaration and evidence, a verdict should have been directed for defendant, since it appeared the accident was the result of a voluntary unlooked for movement of the horses backward.

*Held,* further, that on the facts the doctrine of *res ipsa loquitur* had no application, since the attendant circumstances did not create a presumption of negligence on the part of defendant.

TRESPASS ON THE CASE for negligence.    Heard on exceptions of defendant and sustained.

BAKER, J.    This is an action of trespass on the case to recover damages for injuries alleged to have been received by the plaintiff through the negligence of a servant of the defendant.    At the close of the testimony the defendant moved for the direction of a verdict in its favor on the ground that it had not been shown to be negligent.    The motion was denied and to this ruling the defendant excepted.    The case was submitted to the jury who returned a verdict in favor of the plaintiff for $300.    Whereupon the plaintiff moved for a new trial on the question of damages alone on the ground of their inadequacy, which motion was granted by setting the entire verdict aside, to which ruling the defendant also excepted.    The case is before the court on these two exceptions.

The testimony bearing upon the question of the defendant's liability is in substance as follows:    The plaintiff who was then about sixty-eight and a half years old was injured on Crawford street bridge early in the afternoon of August 2nd, 1913.    He had come through Custom House street and proceeded to cross Crawford street bridge on its northerly sidewalk.    Some repairs were in progress on the bridge, and in consequence the sidewalk at its eastern end on the west side of South Water street was barricaded so that it became necessary to step from the sidewalk into the street in order to pass the obstruction in going to his destination on South Main street.    Without taking particular notice of it as he crossed the bridge he observed a team belonging to the defendant facing towards Custom House street drawn up near the curbing of the sidewalk.    There was an open space of about ten feet at the rear of the team into which he stepped in seeking to avoid the obstruction on the sidewalk. He says that he might have taken one pace after stepping off the sidewalk, but judges that almost as soon as he struck the street the team struck him, hitting him in the back,

pushing or throwing him down with his elbows and one or both knees upon the ground, the chief resulting injury being to his left knee. He says that the team was not moving when he started to leave the sidewalk, that he didn't know what caused it to back, and that he does not know how near to the rear end of the wagon he was when he left the sidewalk.

Frank J. Bradford testified that on the day of the accident he was standing on the north side of Crawford street bridge close to the rail awaiting the arrival of a suburban car coming from Warren, due at 1:40 P. M., but then "a little bit late." He was watching workmen loading timber on a low gear near the northeast end of the bridge. While standing there Mr. Himes passed him and started to cross the street. He says that Mr. Himes "started right back of this team, in kind of a diagonal direction. . . . He had probably taken two steps when this team came back into him, struck him . . . about his right shoulder blade and knocked him flat." The witness did not notice what caused the wagon to go back. While he took no particular notice of the distance of the plaintiff from the team as he stepped from the sidewalk, he would say it was a reasonable distance "a foot or more." The starting of the team back is what attracted his attention to the plaintiff and the team.

John A. Silvia was a witness for the defendant and testified that in the summer of 1913 he was working as a driver for the Cole Teaming Company, but was working for another employer at the time of the trial. He was in charge of defendant's team at the time of the accident, which was a truck with three horses abreast attached thereto in front. The team was alongside of the curbing on the north side of Crawford street bridge headed or facing to the west. The top or body of the truck was a floor or platform, 16½ feet long and 6½ feet wide. There were no sideboards or tailboard: On the sides of this platform was a "ribbon" or edge about two inches high, with places for stakes. The rear wheels of the truck were set underneath the floor of the

truck and no part of them projected out behind its rear end. The truck had been standing there for more than an hour, and while so standing the horses had been fed, but several minutes before the accident, the feed bags had been taken off. While the team stood there a stake had been placed through the spokes of each rear wheel to prevent them from turning around. The truck was not loaded. Just before the accident the driver prepared to drive off with his team. He says that he took the stakes out of the wheels and went on the sidewalk along by the right side of the truck from rear to front in order to get on the team. When he reached the front he stepped upon the "evener" (the cross-bar to which the whiffle-trees are hooked) on which he had to step in order to get up on the seat. Just as he touched the step the horse next the sidewalk started ahead a few inches, perhaps six, as was his habit, and the other two in consequence moved a little to the left. The reins when he started to get up were "on the footboard, between the foot iron and the footboard" and couldn't be reached by him until he got up on the cross-bar. He stepped up on the footboard and picked up the reins, but whether this was done in the act of stepping up or after he was on the footboard, does not clearly appear. He says, however, that he "only just picked up the reins" and while standing on the footboard and before he had sat down, or made any movement to start the team, he heard some one shout, whereupon he looked around "set the reins back again," got off the team and went to the rear end and then first saw Mr. Himes. He wouldn't have known that anything had happened, had he not heard the shout. He said nothing to his horses when he was getting up on the truck, and did nothing to cause them to move and states that the team did not move after the shouting. In answer to the question "Was there any motion of these horses or truck backwards then?" he said: "No, sir, not that I could feel." The record shows that the word "then" refers to a time after he had got up on the footboard and had the reins in his hands. He also

said that he, had driven the horses in question about three years, and that during that time in order to get them to back he always had to "take hold of the reins." This in substance is the entire testimony on the question of liability.

Upon this testimony it seems apparent that the movement of the team was practically simultaneous with the plaintiff's act of stepping from the sidewalk; that this movement was initiated by the off horse starting forward as the driver placed one foot on the evener, or cross-bar; that when he had stepped upon the footboard and had picked up the reins and held them in his hands he heard a shout calling his attention to the accident, which had then already happened. The driver did notice the forward movement, but when asked if there was any motion of the team backwards after he had stepped up on the footboard and had the reins in his hands, answered not that he could feel. It seems probable that the backward movement was then over and that it occurred in the brief interval between his placing his foot on the cross-bar and his reaching a standing position on the footboard with the reins in his hands. But if his answer be taken to mean that he did not feel or observe any backward movement at any time, that would be neither inconceivable nor improbable as a fact, as a slight backward motion might not be noticed while in the act of mounting to the footboard.

(1)    The plaintiff's declaration contains one count, which alleges negligence as follows: "The said defendant corporation by its agent and servant, the driver of its said wagon so carelessly, negligently and unskilfully managed, controlled and drove its said wagon that said wagon was run into and against the plaintiff."

Upon this declaration and this evidence we think the defendant's motion to direct a verdict should have been granted. For while it is clear that the backward movement of the truck threw the plaintiff down, and that this movement of the truck was caused by a backward movement of the horses, we think there is no evidence that the driver did

or said anything to make them so move; that on the contrary the testimony expressly negatives this. There is no evidence of negligence on the part of the driver by any act of omission, as failing to guard against a movement which he had reason to expect or anticipate. We do not overlook the reply of the witness Silvia to the inquiry of defendant's counsel as to what he had to do during the three years he drove the horses in order to get them to back, that he always had to take hold of the reins. This obviously means that he had to use the reins in some way in order to get them to back and not that they would back whenever the reins were taken hold of, as is now argued in plaintiff's brief. Plaintiff's counsel objected to the question and answer and asked to have them stricken from the record. In arguing against this motion defendant's counsel said: "As I understand the situation, the driver of the team gave no word to the horses to back, *did nothing to the reins to get them to back,* and if they claim that the horses were likely to back without any word being given, or any control over them, it seems to me this question is proper. If they don't intend to argue that perhaps it isn't necessary." Plaintiff's counsel without questioning the correctness of this statement said that he did not intend to argue what the horses were accustomed to do; the court allowed the question and answer to stand, and the plaintiff excepted to the ruling. There was no further inquiry along this line. We do not think this question and answer furnish any evidence that the act of taking hold of the reins was negligence on the part of the driver, as is now claimed.

If all the testimony be accepted as true, then it seems probable that the accident was brought about by a voluntary unlooked for movement of the horses backward. If for any good reason the testimony of the driver could be entirely disregarded, then from the plaintiff's evidence it might be *conjectured* that the backing of the team was brought about either by some act of commission or omission of the driver or by a voluntary movement of the horses, but there would

be proper proof of neither supposition. Without, however, in any way attacking the testimony of the driver as untruthful or untrustworthy, the plaintiff invokes and largely rests his case on the doctrine of *res ipsa loquitur*, because the driver failed to definitely explain *why* the horses backed the truck against the plaintiff. We do not think that doctrine is applicable in this case, inasmuch as the inference from the evidence that the horses voluntarily moved the truck back unexpectedly and without negligence on the driver's part is more reasonable than the inference that the driver caused the movement. In other words, the attendant circumstances of the accident, as shown by the evidence, do not create a presumption of negligence on the part of the defendant.

While the facts in *Fagan* v. *R. I. Co.*, 27 R. I. 51, and *Wilbur* v. *R. I. Co.*, 27 R. I. 205, are not similar to those of the present case, the discussions they contain as to the applicability of *res ipsa loquitur* to those cases are instructive and pertinent in the case at bar. See, also, *Benedick* v. *Potts*, 88 Md. 52, as quoted in *Wilbur* v. *R. I. Co., supra*, 207, and *Griffen* v. *Manice*, 166 N. Y. 188, 192–196. In *Button* v. *Frink*, 51 Conn. 342, 349; *Rowe* v. *Such*, 134 Cal. 573; *Swafford* v. *Rosenbloom*, 102 Ill. App. 578, which were all actions for damages for injuries caused by runaway horses, it was held that the fact of the horses running away did not give rise to a presumption of negligence of the driver or require the defendant to explain how or why the runaway occurred. In *Eddy* v. *Union R. R. Co.*, 25 R. I. 451, it was held that the owner of a horse was not liable to one injured by reason of a movement of the horse which could not reasonably be anticipated by its attendant. In *Cadwell* v. *Arnheim*, 152 N. Y. 183, a pair of horses driven by defendant's coachman became frightened, ran away and collided with plaintiff's wagon. The theory of the plaintiff, in seeking to hold the defendant responsible for what occurred was that the coachman might have so controlled his horses after they ran away as to avoid the collision. A verdict

was rendered for the plaintiff and the judgment thereon was affirmed by the General Term.   On appeal to the Court of Appeals the judgment was reversed, the court by GRAY, J., on page 190, saying:  "In the course of the affairs of life, accidents must happen and if they are not attributable to the breach of some legal duty owing to the sufferer, he is without legal right to complain.   In actions for the recovery of damages, charged to the negligent acts of a defendant, it must appear that there has been some breach of duty on his part, or of those towards whom he stands in the position of a master, and affirmative proof must be given, which shows, or tends to show, the negligence of the master or the servant. It will not do to submit a question of negligence to a jury, where the facts are equally consistent with the presence or the absence of negligence; or where the jury could do no more than surmise as to the negligence of the defendant. The difficulty with the plaintiff's case was that the facts failed either to disclose any fault in the driver of the defendant's horses, or to warrant a jury in deciding that he could have controlled the action of the frightened animals.   There was absolutely no evidence on the part of the plaintiff to show that the defendant's servant was negligent in the performance of any duty; unless the opinions of persons, who were not witnesses of the occurrence, as to what a driver might have done in such an emergency, can be regarded as such evidence; and that we are not prepared to hold.   .   .   . To submit the case to the jury, under the evidence, was to invite their speculation upon the question; with nothing in the facts to militate against the truth of the coachman's statements.   It was more than permitting them to surmise as to the negligence of the defendant's servant; it was permitting them to decide that question adversely to him, in the face of the positive testimony and upon opinion evidence of little, if of any, value, under the circumstances."

In the present case we think the verdict must be regarded as only a surmise or conjecture as to the negligence of the defendant's driver, not properly supported by evidence.

The motion to direct a verdict for the defendant should have been granted. This conclusion renders consideration of the other exception unnecessary. The case should be remitted to the Superior Court to enter judgment for the defendant.

The plaintiff will have an opportunity to show cause why this order should not be made on Friday, November 10, 1916, at 10 o'clock in the forenoon.

*James H. Thurston,* for plaintiff.

*Boss & Barnefield,* for defendant.